Defendant-appellant, Becky Wolfe, appeals her conviction in the Madison County Court of Common Pleas for complicity in the escape of a prison inmate.
Ransom Staley was serving a prison term for felonious assault, arising out of his shooting his then-wife in the head, leaving her paralyzed.[1]
Staley and Wolfe were lifelong friends and began a relationship while Staley was imprisoned. Wolfe visited him frequently, and they spoke regularly over the telephone.
In November 1998, Staley was transferred to Madison Correctional Institution ("MCI") in Madison County, Ohio, as part of the Ohio Penal Industries ("OPI") work program. He was assigned to asbestos removal duty, working at out-of-prison sites. After Staley's transfer to MCI, Staley and Wolfe began planning his escape, and Staley would frequently call Wolfe at her home in Heath, Licking County, Ohio.
Whenever Staley called Wolfe from MCI, the telephone calls were recorded by a monitoring system. To call outside, Staley would pick up the receiver in a phone bank in his prison dormitory and enter his personal identification number. He would be prompted to state his name, but any statement would allow the connection to be completed. An automated operator would dial the requested number, informing Wolfe that she was receiving a collect phone call from an inmate at MCI and asking if she would accept the call. Once the call was accepted, the parties could talk.
Inmates at MCI were on notice that their calls could be monitored, both through a prison handbook given to them upon entering the prison and through signs posted at the dormitory telephones. Although the recipients of the outgoing calls were not told the calls were monitored, they were informed they were receiving a call from a MCI inmate. All visitors to the prison were subjected to extensive searches and security measures.
By late December 1998, after Wolfe and Staley planned Staley's escape, Wolfe quit her job. Wolfe took almost $10,000 from Caroline Hurst, Staley's sister. Staley had earlier given the money to Hurst, and he told Hurst to give it to Wolfe. Hurst believed that the money would be invested. Wolfe also purchased a cellular telephone.
On December 29, 1998, Staley ("RS") made two calls to Wolfe ("BW"). The first, at 11:37 a.m., was to her cellular phone:[2]
 Operator: This is the MCI operator. State your name at the tone.
Staley: 762.
Operator: Your call is being processed. Do not hang up.
The call was refused by Wolfe. Staley immediately called Wolfe at her home:
BW: It looks okay.
RS: What'd it say?
BW: 762.
RS: (laughs)
BW: Is that what it said.
RS: That's what it said.
BW: Okay.
RS: All right baby.
BW: You are cool. Well, you're not going to hang up, are you?
RS: No.
* * *
RS: (laughs) You have to do any more shopping?
 BW: Well, I don't know. I don't know. Is there anything I need? First time in my life I've had plenty enough money that I could go shopping if I really wanted to go, and there ain't nothing I want. Isn't that sad? Huh?
* * *
 BW: We're too close to screw up anything now. I am not that stupid.
* * *
 RS: All I want to do is get out of here and go on vacation. That's all.
 BW: Last night about — I don't know what time it came on, but they was advertising Hawaii.
RS: Uh-huh.
 BW: And they had a number. I didn't even write it down, but I thought that would be a place to get some information. Like eight days and 10 nights. I don't remember what it was. It said to call your travel agency or call that number.
RS: It won't be enough.
BW: Uh-huh.
RS: Huh?
 BW: Yes, sir. You said we was going down Route 1.
RS: We will.
BW: Well?
 RS: I thought we was going to do 15 days over there.
 BW: Well, we can do 15 days. I'm sure they have a 15-day package. If not, we'll buy two 10s.
RS: Yeah.
BW: (laughs) Yeah?
 RS: I'm telling you. And we're not going down Route 1. We're going up.
 BW: Well, whichever way. Whatever way, it don't matter as long as I'm sitting beside of you.
 RS: It don't matter what we see up Route 1. I mean, it's pretty up through there, but that ain't what I want to show you.
BW: What do you want to show me?
RS: I want to show you Susanville, California.
* * *
RS: Baby, it's almost over now.
 BW: I know. Do you need for me to go shopping for anything?
RS: No. No. I don't.
BW: Okay.
 RS: I just — I want to make sure you got everything you need.
* * *
BW: (inaudible) Thursday.
RS: Uh-huh.
BW: Uh-huh.
RS: After 2:00.
BW: Uh-huh.
RS: Caroline.
BW: Uh-huh.
 RS: Okay. She said you could call and verify it, just told me to tell you Thursday after 2:00. You guys can have tea, I guess. I don't know what you guys do.
BW: That's New year's Eve, right?
RS: Yes.
* * *
 RS: Magic number will be about Saturday, magic number will be about three.
 BW: Magic number will be three. I don't understand that one. Oh, yes, I do. Yeah. Yeah. Sounds like a good number to me.
RS: Hey.
 BW: We are too close to let go now. Nothing more important than what we got, so — and that's the way I feel. I want nothing more than you to come home and be in my arms for the rest of my life, or the rest of yours, whichever comes first.
* * *
RS: You'll be fine baby.
 BW: I hope so. I'm going to need you to assure me.
RS: Huh?
BW: I said I'm going to need you to reassure me.
RS: That will be fine. Talk to me.
BW: No. You talk to me.
On December 30, 1998, at 1:15 p.m., Staley called Wolfe at home:
 BW: Okay, I'm cleaning the car out, front and back, got that all taken care of.
RS: Didn't sweep it out, did you?
BW: Huh?
RS: You didn't sweep it out, did you?
 BW: No. Oh, no. Nope. Every time I get in, I look down at that.
RS: You better shut up.
BW: Huh?
RS: You better shut up.
BW: Why?
RS: `Cause.
BW: Okay.
RS: Huh?
BW: I'm not saying another word.
 RS: Baby, I don't care if you talk, just watch what you say.
Staley called again that day at 5:08 p.m.:
 BW: Very good. I'm standing here doing my dishes. I thought one of the these days I'm going to wash more than one plate.
RS: (laughs) Real soon.
BW: Oh, God.
RS: Huh?
BW: What is wrong with you?
RS: What's wrong with me?
BW: Uh-huh.
 RS: I'm just — I'm just so close now. I just don't want nothing happening.
 BW: It will be okay baby. Well, there she goes back up the other way.
RS: What will change, and that's a promise.
BW: Uh-huh. Well, see you tomorrow.
RS: I'm telling you.
BW: Are you getting your stuff ready?
RS: Huh?
BW: Are you getting your stuff ready?
RS: Oh, yeah.
BW: Psyched up and ready to take care of me?
RS: Uh-huh.
BW: Uh-huh.
Staley again called at 6:55 p.m. that night:
 BW: She wanted to know if — what I was going to do with my pictures, my cross stitch thing that I do.
RS: Oh, yeah.
 BW: And I said why, did you want one of them? And she said no. She's going to do what we talked about earlier. * * * Know what I mean.
RS: I think I do. I'm not sure.
BW: Well, I'm taking them with me tomorrow night.
RS: Oh.
* * *
 BW: So I'm supposed to be at her house at 9:00 o'clock tomorrow night.
RS: Don't try that.
BW: Honey.
RS: What? Get them other things, too.
BW: I know. The thing is I'm limited on space.
RS: Why?
 BW: Because my cars over at — I'll just tell her to give me the key to the what you call it and just do that all weekend, but then —
RS: Then what?
BW: Well, you don't?
RS: Huh?
 BW: Shipping it and all that stuff, you don't know if it would get there or not.
RS: Well —
BW: Huh?
 RS: It will get there. Do you know what? You'll be fine.
BW: You think so.
RS: I know so.
BW: We'll see.
RS: Huh?
BW: We'll see.
RS: I'm sure hoping you ain't got any doubts.
BW: Huh?
RS: I sure hoping you ain't got any doubts.
BW: I don't know about that.
RS: Now what's up?
 BW: Honey, it's nothing. I'll talk to you Saturday. You made any other phone calls?
RS: Huh?
BW: You made any other phone calls?
RS: Have I made any other?
BW: Uh-huh.
RS: No.
BW: When you going to do that?
RS: Saturday after I talk with you. Why?
BW: I just wondered, baby.
RS: I told you that the other night.
Staley called Wolfe at home at 10:17 a.m. on December 31, 1998:
BW: Not too many people I'd do this for.
RS: I certainly hope not.
BW: I'm telling you.
Staley again called Wolfe at 4:32 p.m. that day:
RS: We will celebrate this new year together.
BW: Uh-huh. I do mean together, as in like glue.
RS: I'm telling you.
 BW: So the grand total is ten four, and a hundred in my billfold just in case. Okay?
RS: Hey, I understand completely baby.
At 10:12 p.m. that night, Staley again called:
RS: Yes or no question.
BW: Okay.
RS: Are you ready?
BW: Yes.
RS: Okay.
BW: Are you?
RS: Yes. Yes, I am.
* * *
BW: I wish you were here.
RS: Why?
BW: Because.
RS: Because why?
BW: Because I'd just like to have you here.
RS: I'll be there soon.
BW: Huh?
RS: I'll be there soon.
On January 1, 1999, Staley called Wolfe's home at 4:25 p.m.:
RS: Let me tell you what I found out.
BW: Okay. What did you find out, baby?
RS: This is a must.
BW: Okay.
RS: Okay. * * * I'll call you back afterwhile.
BW: Okay.
RS: Okay. But you know what I'm talking about.
BW: I'm — no, not sure.
RS: The week.
BW: This week?
RS: Yes.
BW: Okay.
RS: All right.
BW: All right.
Staley called back at 6:53 p.m. that night:
 RS: You better get up at 6:00 is all I got to tell you.
BW: Why?
RS: Check the situation out.
 BW: Well, it ain't going to be any better at 6:00 than it is at 7:00, is it?
RS: Baby, I don't have any idea, just —
BW: I know. You just want me up there.
RS: No. No. We got some stuff we got to go over.
 BW: I know. Well, you better have it ready in your mind and not be messing around.
RS: Hey, I'm not messing around.
BW: It's only five more days `til your birthday.
RS: Yeah. What are you getting me?
BW: What do you think?
RS: I don't know. Give me a hint.
 BW: It will be a surprise. Nothing you ain't ever had before, but it will be —
* * *
RS: No, wait `til I get home.
Wolfe visited Staley at MCI on Saturday, January 2, 1999.
On January 4, 1999, Wolfe procured transportation and settled affairs. She rented storage space at Red Storage, a personal storage facility in Heath, in which she placed personal belongings and her car. She had Hurst store things in her home. Wolfe went to the Avis Rent-A-Car dealership in Heath and rented a white 1998 Buick Century for one week. She also went to various stores buying clothing and other goods.
Throughout January 4, Staley called Wolfe at her home. The first call was at 8:09 a.m.:
BW: So he didn't have anything to say, huh?
RS: Huh?
BW: He didn't have anything else to say?
 RS: Well, he said everything was ready and all that, just got to see what he does.
BW: Okey dokey.
RS: He said it's looking good.
BW: Uh-huh.
RS: So we'll just go from there.
BW: Okay.
 RS: You just go ahead and get everything ready, just like I'm coming home, `cause I'm coming home. It's just a matter of time.
BW: Okay baby. I can do that.
 RS: All right. Like I said we'll get — I'll get the date out of him before the week's out.
BW: Okay.
 RS: I'm going to send Caroline back down there, too.
BW: Yeah.
Staley called again at 2:00 p.m.:
RS: What are you doing?
BW: Oh, just putting some stuff away.
RS: Get everything taken care of.
BW: Yep.
* * *
BW: Okay. I just got here.
RS: Did you.
BW: Uh-huh. It's bad out.
RS: I thought you said it wasn't.
 BW: Well, the roads aren't, but the parking lots and stuff are horrible. I just about rammed a brand new car.
RS: You better be talking to me.
BW: Well, you ask me something.
RS: Did you get everything else?
 BW: Yeah. God, you wouldn't believe how easy that was. That was just over the phone.
RS: Huh?
BW: Just over the phone.
RS: So did you get the blue?
BW: No.
RS: What color did you get?
 BW: A white — white. Oh, God. But it's the same initials?
RS: Is it green.
BW: No. I told you white.
 RS: But you said initials. I said the same as green.
 BW: Oh, no. The other. Something else. Not even the same — same make.
 RS: Now you got me lost, kid. I don't have any idea.
 BW: Okay. I might as well just say the Goddamn thing right out loud. Huh?
 RS: No. I'm just saying I'm lost. Same initials, same this, same that.
BW: Well —
RS: It's different.
BW: You said blue.
RS: Yes.
BW: Yeah?
RS: And you said white.
BW: Well, it starts with a B. You got that much.
RS: And I got it baby.
BW: You sure?
RS: Huh?
BW: You sure?
RS: Oh, God. Oh. So you got everything?
 BW: Yep. Yes, I do. Well, not everything. * * * But Everything important I have, yes.
RS: Huh?
 BW: Everything important I have, yes. That car I almost hit was one of those Century's.
RS: Uh-huh.
 BW: Brand new one. I thought it hit it, man. I would be in trouble big time. Okay?
RS: Yep. What?
 BW: Just wondering. You yell at me everyday about hitting cars and shit.
* * *
RS: Hey.
BW: Yes?
RS: If worst comes to worst.
BW: Uh-huh.
RS: We may be back to —
BW: Oh, God.
RS: What?
BW: Go ahead. May be back to what?
RS: Let me — the other day.
 BW: I don't understand. And don't you dare yell at me?
RS: I'm not. The first time. You don't understand?
 BW: I think I do, but I'm afraid to say that I do.
RS: Huh?
 BW: I said I think I do, but I'm afraid to say that I do.
RS: Oh.
BW: The other way?
RS: Huh?
BW: The other way?
RS: Where were you the first day?
BW: Oh God. Not right there.
RS: Will you shut up?
BW: Is that what you mean?
RS: Huh?
BW: Is that what you mean?
 RS: That's what I mean. I said yes. If worst comes to worst.
BW: Well, how am I going to know that?
RS: I will call you in the morning.
BW: See, now you've got me confused.
RS: Oh, God.
BW: Don't do that.
RS: I will call you in the morning.
 BW: Okay. Well, see, that's not what I thought you meant.
 RS: Well, I know that's not what you thought I mean, that's what I meant.
BW: `Cause you said the first time.
* * *
RS: I'm just telling you if things change, dear.
* * *
RS: What we discussed the other day —
BW: Got ya.
RS: Stick to it.
BW: Then why did you just say the other?
 RS: Because if it changes, I will tell you on the phone in the morning.
Staley immediately called back:
RS: We'll make this a lot simpler.
BW: Oh, geez.
RS: Huh?
BW: Okay.
 RS: Go — go to McDonald's for breakfast in the morning.
BW: Yeah.
RS: And wait for my call.
BW: Okay. Well, I knew that much.
 RS: Well, that's all. That's all that I'm trying to say.
BW: Huh-uh.
RS: I did too. I just said if there is any change.
 BW: Okay. How late are you going to need to call me tonight?
RS: Why? You leaving?
 BW: I'm thinking about it. I'm thinking about going up that way probably so I won't have so far to drive.
RS: What time you want to leave.
BW: Well, I don't know.
 RS: You tell me what time you're going to leave and I'll tell you what time I'll call.
 BW: Well, probably before they shut the phones off at 9:00. 9:00 would probably be a good time or thereabouts.
RS: Well, that's fine.
BW: Okay.
 RS: I will call at 7:30 and talk to you until 9:00.
 BW: Okay. I'd rather do that than get up early in the morning. Now I got to go shopping.
RS: I thought you was done.
 BW: I got everything done that's necessary. Okay. Now I'm going shopping.
RS: What time would you figure you'll be back.
 BW: I should be back by 4:00. I'm just going to run into town here and check into a couple of places and see what I can do with this hair, and then I'm going to go to Meijer's and pick me up a couple pairs of jeans and drop some stuff off over where I left the other thing. And then tonight I'll get rid of this one and everything will be okey dokey.
RS: Okay.
* * *
BW: You're making me nervous.
RS: I ain't making you nervous.
BW: Everything has went really good and smooth.
 RS: That's what I'm talking about, baby. You just —
* * *
 BW: I'm going to finish up with the rest of what's here and then load it up and get it going.
RS: Well —
 BW: And then I'm going shopping. Then I should be back probably 4:00 or before then probably, but I wouldn't try `til 4:00.
* * *
 RS: * * * I love you baby. I know you know what you're doing.
BW: Well, I'm trying.
RS: Well
BW: I don't know about that, but —
* * *
 RS: That's fine. That's fine. You take care of your banking?
 BW: I didn't know there was anything else I needed to do.
RS: Thought you said the other day that —
 BW: Oh, yeah. I'm going to do that. I don't know about, I'm about half afraid to. I'm afraid he'll hold it. You know what I mean?
* * *
BW: I'm going to write two letters.
RS: Huh?
BW: I'm going to write two letters. Is that okay?
RS: Yeah.
BW: Just to explain what to do.
RS: Well, don't worry about it.
BW: Huh?
 RS: Don't worry about it. You know what you're doing. You don't have to explain nothing.
* * *
 BW: I got to make another phone call yet get some information on that, on the important thing.
RS: Yeah, `cause I need — I just need —
 BW: I ain't going to know the place. I'm just getting information on —
RS: I know.
BW: Okay. What we need to have.
Staley again called Wolfe at 4:36 p.m.:
RS: What are you doing?
BW: I'm tying up some loose ends, why?
RS: I just wondered. Hey.
BW: Huh?
RS: You need to make a phone call.
BW: I do?
RS: Yeah.
BW: Who to?
RS: Down to Caroline.
BW: Why?
RS: For a number.
BW: I call her?
RS: Yeah.
BW: Okay. I can do that.
* * *
 RS: Don't go anywhere tomorrow (inaudible) until we see.
BW: Okay.
RS: I don't want you out running around.
BW: Okay. But if you knew, you'd be so proud.
RS: Hey honey, I am proud of you.
BW: And I'm telling you just leave me alone.
RS: I am. I'm sorry.
BW: I have just taken care of everything.
RS: That's fine.
BW: And I am proud of myself.
RS: All right.
* * *
RS: What did you find out on your —
 BW: I got to do that. I'll do that next time you call.
RS: All right.
 BW: What do you want me — I'm not sure what you want me to do on that, just find out 20
 RS: Yeah. Find out what you got to have. That's it. See what kind of waiting period they got.
 BW: Uh-huh. I figured that. You hang up so I can do that, huh?
Staley again called at 6:20 p.m.:
RS: Did you get everything done?
BW: Yes.
RS: Okay.
BW: Okay.
 RS: You said you got a new one when I was talking about —
BW: A `98.
RS: Huh?
BW: A `98.
* * *
RS: So did you get a bench seat?
BW: A what? Yes. I thought all right. This is cool.
* * *
BW: I got four more.
RS: For more?
BW: Four hundred.
RS: Oh.
BW: More.
 RS: Is it cold? I know you might want to say quarter `til 7:00, 7:00 o'clock, take a drive by there, see if anybody is there.
BW: Okay.
 RS: But like I say — oh, shoot. Okay. That's the end of that.
* * *
BW: Oh, I called.
RS: Yeah.
 BW: I have to go to the courthouse, no waiting period, have to have a valid driver's license, and if you try to divorce, you have to know the date that it was final or approved or whatever the word is.
RS: I can't remember when the hell mine was.
Staley called again that night at 7:33 p.m.:
 BW: I was just laying here trying to decide whether I want to do that tonight and go to bed.
RS: Well, I was going to mention that.
BW: What?
RS: You know, you may want to stay tomorrow night.
BW: Okay. Oh, you mean just —
RS: In case something don't work out.
BW: Yeah. Just stay up there tomorrow night?
 RS: Take — better not to go back over there tomorrow.
BW: Uh-huh.
RS: Know what I mean?
BW: Uh-huh.
RS: Okay.
 BW: Yeah. Okey dokey. The only thing is you won't be able to call.
RS: Huh?
BW: Only thing is you won't be able to call.
 RS: Well, you just call Caroline and let her know you're all right and I'll be all right.
BW: Okay. I can do that. Thought she's sick?
RS: Who? Caroline?
BW: Uh-huh.
RS: Did you call?
BW: Uh-huh. I told you I did. You told me to.
RS: Yeah. What'd you find out?
BW: I got it.
RS: All right baby. That's what I'm talking about.
BW: Hey, I got it under control. Okay?
RS: You are a genius.
 BW: Now, if they can just hang on. I forgot to ask her if she called Johnson.
RS: I called him this morning.
 BW: I know, but you said you told her so. Said she'd been sick ever since I was there. I said okay. My fault.
RS: Why are you hanging, hanging on?
BW: What?
RS: You said now if I can just hang on.
 BW: I didn't say that. I said if we can just hang on. Quit talking baby. Quit talking.
RS: We'll be all right. We'll be fine darling.
BW: Well, I certainly hope so.
RS: Four more weeks.
BW: Uh-huh. I should be pregnant by then. Oh.
RS: Yeah, well.
* * *
RS: So what are we doing here baby? Talk to me.
BW: About what, baby?
RS: You staying?
BW: Tonight?
RS: Yes.
BW: Uh-huh.
RS: Okay.
BW: But that means — Oh, God.
RS: God what?
 BW: 5:00 o'clock in the morning, the traffic and shit. They had a big wreck, a six car pile up there on 70 tonight or this afternoon, had everything all backed up.
RS: Was you clear up here?
 BW: No. I heard it on the radio. Don't you listen to the radio?
RS: Oh, no.
BW: Well, you should.
 RS: I left it out there on the truck when I was working — digging — digging holes and I never brought it. Digging holes, listening to Alan Jackson, Vince Gill, and that's how all them cases and shit got broke.
 BW: Well, I got your new ones today. I got Cds, then I went and got this present, so I had to go back and get the stuff. It's like, okay.
RS: Okay.
 BW: We'll just play them. Anyway, maybe I'll just go shopping tomorrow.
RS: Well maybe you can do that.
 BW: I don't know what for. That's awful, to get in them stores and walk around and think well, what — what should I buy?
RS: Anything you want.
BW: Huh?
RS: Anything you want.
 BW: Yeah, but there's nothing I want. That's the worst part. Huh?
Staley called again later that night at 9:39 p.m.:
 BW: If I drive past there and nothing is happening —
RS: Uh-huh.
BW: What do you want?
RS: Just —
BW: Just go where —
RS: Yeah.
BW: Okay
RS: And wait on my call. Wait on somebody's call.
BW: (Inaudible)
RS: Hey. Just shut up.
BW: Okay. I will.
RS: Okay. I'll get in touch with you, baby.
BW: I hope the phone's still on.
RS: Huh?
 BW: I was thinking earlier I hope the phone's still on tomorrow.
RS: Baby, I told you to take care of that.
BW: You didn't not. You said wait.
RS: I did. I said baby, we got to have that.
BW: Oh, well, guess what?
RS: What?
 BW: I didn't, but it was all right today, so hopefully, and if not I will tomorrow. I mean — — nevermind. I can call and put it on my card.
RS: Huh?
 BW: I can call and put it on my card. I probably ought to do that tonight.
RS: Yes, you should.
 BW: I will find the number. So I forgot one thing, okay.
RS: Hey, all right.
BW: I thought I did pretty good, one.
RS: I think you're great.
BW: Huh?
RS: I think you're great. Say what?
 BW: I'm looking. I don't see anything on there. Start digging in my paperwork. Man, it's cold out. It will be worse than that in the morning. You know what I mean?
RS: Uh-huh.
BW: Do you even care?
RS: Yes, I do.
BW: No.
RS: Yes, I do. You better be finding that.
 BW: I'm looking. I'm looking. What am I going to do if I can't? Here it is.
RS: Hey, bingo.
 BW: Hey, never underestimate me. Time to take a few minutes, but let's see. My other one you could call and do it right over the phone. 1-800-Airtouch. Talk to me baby.
* * *
 RS: If a — this don't work out for you tomorrow.
BW: Uh-huh.
 RS: You can make up your mind on what you want to do tomorrow night. You know what I mean?
BW: I could come back home?
RS: That's entirely up to you.
BW: Okay. Well, I may.
RS: Huh?
 BW: I mean just to be with the phone. And you know what I mean.
RS: All right.
 BW: Cause I know how you are when you can't talk to me.
 RS: I know. All right. Well, find out what's happening.
BW: You'll never probably not know `til —
RS: I'll find out.
 BW: Customer care at Air — I'd think this 1-800-Airtouch will probably do it. I'll try it here when I hang up. Okay?
Staley called one last time that night at 10:16 p.m.:
 BW: Can't do it `til 8:00 o'clock in the morning, but I can do it. So that's all I can do.
RS: All you can do.
BW: You just about caught me outside.
RS: Where were you going?
 BW: I got to go out to the car so I won't have to do it in the morning.
 RS: Out to the car so I wouldn't have to do it in the morning.
 BW: Throw some stuff in. I've always got my arms full in the morning and I don't want to have to, you know — all I want to do is pick my coat up and say let's go.
RS: And your little box.
BW: Bring my little box? Okay.
In the early morning of January 5, 1999, Staley called Wolfe two times. The first call was at 7:04 a.m. The call was not accepted, but Staley left a message:
 Operator: This is the MCI operator. State your name at the tone.
RS: Green warehouse.
 Operator: Your call is being processed. Do not hang up. The party you have called did not accept the charges. Please hang up.
Staley immediately called back:
 Operator: This is the MCI operator. State your name at the tone.
RS: 7:30.
 Operator: Your call is being processed. Do not hang up. The party you have called did not accept the charges. Please hang up.
After making the phone calls, Staley joined three other inmates on the asbestos work crew. They left MCI with an OPI work supervisor and drove to the OPI warehouse on State Route 56 ("S.R. 56"). The OPI warehouse is a whitish or tan color and is located on S.R. 56 outside of the MCI perimeter. The warehouse is next to a bowling alley, with the two buildings sharing a large parking lot. A pay phone is located in the parking lot next to S.R. 56.
The MCI asbestos work crew arrived at the OPI warehouse at about 7:30 a.m. that morning. The crew loaded the van with asbestos removal gear and supplies and prepared to leave for the day. At about 8:00 a.m., the OPI supervisor noticed that Staley was missing. The supervisor called MCI, which sent out officers and investigators to look for Staley.
Investigator Walt Ashbridge, the primary MCI investigator, pulled the tapes of all phone calls made by Staley in the preceding days. Listening to the tapes, it became obvious that Wolfe was involved in the escape. One indication was the final two phone calls, which set forth the time Staley would arrive at the OPI warehouse. Also, Staley's "green warehouse" comment was seen as confirmation of the escape taking place, because the OPI warehouse was not green. The Heath Police Department ("HPD") was notified of Wolfe's suspected complicity in the escape and began its own investigation. The HPD found that Wolfe had rented the Buick Century and notified MCI of such.
Investigator Ashbridge and others determined that Staley and Wolfe were planning to travel to Las Vegas and up Route 1 in California through San Francisco. An unlawful flight from prosecution ("UFAP") warrant was issued, which was logged into National Crime Information Center ("NCIC") database. The UFAP warrant allowed the Federal Bureau of Investigation ("FBI") to become involved in the manhunt, since it signaled that Staley's escape was now an interstate crime.
The first indications of where Staley and Wolfe were traveling came in mid-January 1999. On January 9, 1999, at approximately 4:45 a.m., Officer Michael James Baird of the Abilene, Texas Police Department noticed the Buick in a parking lot at a car and tractor-trailer wash facility. The car looked suspicious because it was left unattended at a location known for drug sales and car theft. Officer Baird noticed that the Buick was a rental car and ran its license plate number through the computer database. At that time, the NCIC check came back clear. He had officials in Columbus, Ohio contacted, but they indicated no reports of the car being stolen.
On January 13, 1999, the Heath Avis dealership filed a report that the Buick had been stolen. It had been due back on January 11, 1999, but it had not been returned. At that time, the car was listed as stolen in the NCIC database.[3] On January 15, 1999, Officer Baird again noticed the Buick sitting in the same spot. He again checked the license plates, and this time a report came back that the car was stolen.
Officer Baird searched the Buick and had the HPD notified that he found the car. The car's driver seat was pulled forward as if a shorter person had been driving. The passenger seat was set farther back, as if for a taller person.
Even with Officer Baird's discovery of the Buick, there was nothing pointing to where Wolfe and Staley had gone. That changed on February 1, 1999. That morning, Troopers Eric Kemmer and Bruce Roper of the Nevada Highway Patrol were conducting unlawful parking enforcement in a dirt lot in Primm, Nevada, just outside of Las Vegas. The lot was designated as "no parking," but drivers regularly used it as a rest stop.
The troopers noticed a white four-door Plymouth sitting in the lot's eastern area. The Plymouth had only a rear license plate, but Nevada required license plates on the front and back bumpers. The Plymouth started to drive off, but the troopers stopped the vehicle. Tpr. Roper made contact with Staley and noticed a plastic bag full of cash on the front console.
Tpr. Kemmer called in the Plymouth's license plate, and a report came back that the plate was stolen. At first, Staley and Wolfe refused to identify themselves, but Wolfe eventually produced a driver's license. Staley and Wolfe were handcuffed and placed in the patrol cruiser. When asked where they had come from and how long they had been in the Plymouth, Wolfe responded, "You'll find out soon enough."
The troopers ran computer checks on Staley and Wolfe, and numerous warrants for their arrests were returned. The troopers searched the Plymouth, finding $4,800 in the plastic bag, food items and clothing, three cellular phones, birth certificates, two sets of Texas license plates and one set of Indiana license plates. They also found letters, including one from just before Staley's escape saying "everything a go for next week."
Staley and Wolfe were interrogated in Las Vegas by FBI Special Agent James Patrick, a member of the FBI's Fugitive Squad. Wolfe stated that she and Staley had talked about his escape for some time. She quit work weeks earlier to plan the escape and get money. Wolfe admitted to renting the Buick Century, but she maintained that she met Staley in Abilene and had not participated in his actual escape. Wolfe stated that she "would do it again in a heartbeat." She was relieved at how they were arrested, because Staley had indicated that they would not be taken alive, that they "would go out in a blaze of glory."
Wolfe was indicted on one count of aiding and abetting Staley's escape in violation of R.C. 2921.34(A)(1) and R.C. 2023.03(A)(2), a second degree felony.[4] Wolfe filed a motion to suppress the recordings of her conversations with Staley. A suppression hearing was held at which Investigator Ashbridge and Wolfe testified. The trial court overruled Wolfe's motion to suppress.
A jury trial was held. The state presented testimony from the law enforcement officers involved in the case, as well as Hurst and MCI officials. Wolfe testified in her own defense, and Staley testified in her behalf. Wolfe and Staley maintained that she was not present when Staley fled the OPI warehouse. The jury found Wolfe guilty. A sentencing hearing was held at which Wolfe was ordered to serve a three year prison term. Wolfe appeals.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION FOR SUPPRESSION OF THE TAPES RECORDED BY THE PRISON PERSONNEL OF HER CONVERSATIONS WITH INMATE RANSOM STALEY, VIOLATING HER RIGHTS UNDER THE FOURTH
AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, TO HER SUBSTANTIAL PREJUDICE.
Wolfe contends that the trial court should have granted her motion to suppress the recorded conversations between herself and Staley. She argues that she had a legitimate expectation of privacy which was violated when MCI recorded the conversations.
When ruling on a motion to suppress, the trial court assumes the role of trier of fact and is in the best position to evaluate the credibility of witnesses and resolve questions of fact. State v. Clay (1973),34 Ohio St.2d 250, 251. When reviewing the decision of a trial court on a motion to suppress, an appellate court must accept the findings of fact if supported by competent, credible evidence. State v. Retherford
(1994), 93 Ohio App.3d 586, 593, appeal dismissed, 69 Ohio St.3d 1488. Accepting such facts as true, the appellate court must then independently determine, as a matter of law, and without deference to the trial court's conclusion, whether the facts satisfy the applicable legal standard. Id.
The Fourth Amendment to the United States Constitution, as applicable to the states through the Fourteenth Amendment,[5] provides in part:
 The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]
The Amendment generally protects against invasions of one's privacy by the state. But this protection extends only so far as where a person's expectation of privacy is exhibited and objectively reasonable. Katz v.United States (1967), 389 U.S. 347, 88 S.Ct. 507.[6]
The constitutional rights of inmates survive the fact of their incarceration, but only if those rights are consistent with their status as inmates and with legitimate penological goals and concerns. See Sandinv. Conner (1995), 515 U.S. 472, 485, 115 S.Ct. 2293, 2301; Pell v.Procunier (1974), 417 U.S. 817, 822, 94 S.Ct. 2800, 2804. Whether a given penological regulation or practice infringes upon an inmates rights is determined by whether such regulation or practice "is reasonably related to legitimate penological interests." Washington v. Harper (1990),494 U.S. 210, 223, 110 S.Ct. 1028, 1037, quoting Turner v. Safley
(1987), 482 U.S. 78, 89, 107 S.Ct. 2254, 2261; Pollock v. Brigano
(1998), 130 Ohio App.3d 505, 510, appeal dismissed (1999),85 Ohio St.3d 1461, certiorari denied, ___ U.S. ___, 120 S.Ct. 248. Penological interests include the deterrence of crime, rehabilitation of prisoners, and institutional security, safety, and control. O'Lone v.Estate of Shabazz (1987), 482 U.S. 342, 348, 107 S.Ct. 2400, 2404;Shockey v. Winfield (1994), 97 Ohio App.3d 409, 413. Deference is given to the judgment of the prison officials who formulate regulations to effectuate those interests. Bell v. Wolfish (1979), 441 U.S. 520, 547,99 S.Ct. 1861, 1878; Jones v. North Carolina Prisoners' Labor Union, Inc.
(1977), 433 U.S. 119, 126, 97 S.Ct. 2532, 2538 ("NCPLU"); see Weaver v.Jago (C.A. 6 1982), 675 F.2d 116, 118-119.
When outsiders interact with inmates, the rights of the outsiders are affected by these restrictions upon inmate rights which vindicate valid penological interests. Rights the outsiders have in the non-prison outside world may be regulated by proper inmate rights restrictions. Thornburghv. Abbott (1989), 490 U.S. 401, 407-408, 109 S.Ct. 1874, 1878-1879;[7]Bazzetta v. McGinnis (C.A.6 1997), 124 F.3d 774, 780. As noted inThornburgh:
 We do not think it sufficient to focus * * * on the identity of the individuals whose rights allegedly have been infringed. Although the Court took special note in Procunier v. Martinez [1974], 416 U.S. 396, 94 S.Ct. 1800[,] of the fact that the rights of non-prisoners were at issue, and stated a rule in [Safley] for circumstances in which "a prison regulation impinges on inmates' constitutional rights," any attempt to forge separate standards for cases implicating the rights of outsiders is out of step with the intervening decisions in [Pell], [NCPLU], and [Wolfish]. These three cases, on which the Court expressly relied in Turner when it announced the reasonableness standard for "inmates' constitutional rights" cases, all involved regulations that affected rights of prisoners and outsiders.
490 U.S. at 410 n. 9, 109 S.Ct. 1880 n. 9. Thus,
 the Thornburgh Court stressed [Safley's] mandate that even though prison regulations or practices might burden the fundamental rights of "outsiders," the proper inquiry was whether the regulation or practice in question was reasonably related to legitimate penological objectives.
Brewer v. Wilkinson (C.A.5 1993), 3 F.3d 816, 823 n. 9, certiorari denied (1994), 510 U.S. 1123, 114 S.Ct. 1081.
Inmates generally do not have a legitimate expectation of privacy. In fact, the traditional Fourth Amendment right of privacy is "fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order." Hudson v. Palmer (1984), 468 U.S. 517, 527-528, 104 S.Ct. 3194,3201; see In re Nicholson (1999), 132 Ohio App.3d 303, 308, appeal dismissed, 86 Ohio St.3d 1403. It is reasonable to monitor unprivileged inmate telephone conversations, particularly where the inmate knows that the conversations may be monitored. United States v. Amen (C.A.2 1987),831 F.2d 373, 380, certiorari denied (1988), 485 U.S. 1021,108 S.Ct. 1573; State v. Smith (1997), 117 Ohio App.3d 656, 661, appeal dismissed,79 Ohio St.3d 1418, certiorari denied, 522 U.S. 972, 118 S.Ct. 424. This is because
 when placed on notice of telephone monitoring, a prisoner does not have the requisite subjective expectation of privacy[, and additionally], society is not willing to [objectively] recognize any such subjective expectation of privacy because the institutional interest in security outweighs the prisoner's privacy rights.
Id. As noted by one court:
 [T]he recording of outbound calls from a prison is reasonable given institutional security concerns. There is, of course, the risk of escape plans. Also, not surprisingly, criminal conduct does not always end when the prison gate closes behind a convict, and available avenues often are used to facilitate further criminal activity. In fact, this court has seen a number of instances in which prison telephones were used to commit crimes and the recordings of calls used as evidence.
United States v. Harrison (M.D.Penn. 1997), 986 F. Supp. 280, 281.
Because of the restricted nature of inmate rights, non-attorney non-inmates interacting with inmates cannot legitimately claim they are afforded greater rights:
 Contacts between inmates and noninmates may justify otherwise impermissible intrusions into the noninmates' privacy. Thus, noninmate mail to prisoners may be subject to inspection; and noninmate visitors may have their conversations with inmates monitored, or be subject, based upon reasonable suspicion, to strip searches. With respect to telephone communications, the public is on notice pursuant to regulations * * * that prison officials are required to establish procedures for monitoring inmates' calls to noninmates. Given the institution's strong interest in preserving security, we conclude that the interception of calls from inmates to noninmates does not violate the privacy right of noninmates. (Citations omitted.)
United States v. Willoughby (C.A.2 1988), 860 F.2d 15, 21-22, certiorari denied (1989), 488 U.S. 1033, 109 S.Ct. 846. This lessened privacy right is especially appropriate where the non-inmate is aware of institutional policies herself or is aware that her conversations with an inmate may be monitored. See United States v. Sababu (C.A.7 1989), 891 F.2d 1308,1329. Knowledge may be inferred from the circumstances: whether the non-inmate was a frequent visitor to the institution and thus aware of security measures; whether the non-inmate is put on notice through published administrative regulations; and whether the non-inmate speaks in "coded" language. Other factors may be present in a given case. See Id. It must be remembered that, as noted by previous courts, "[i]n prison, official surveillance has traditionally been the order of the day." Id.
 It is difficult to image that the considerations that justify monitoring and recording of a prisoner's utterances could somehow not apply to the other end of the telephone. The rights of free persons may well at times be implicated and stand or fall with the rights of prisoners.
United States v. Vasta (S.D.N.Y. 1986), 649 F. Supp. 974, 991.
Turning to the instant case, it is inconceivable that Wolfe could believe that she had a recognized privacy interest in her conversations with Staley. She was called by Staley from inside MCI, where high security and monitoring is required. Wolfe visited Staley up to three times a month at MCI. At the very least, she should have been aware of the institution's security measures. Ohio has published administrative regulations concerning prison procedures and security, including regulations on mail, visits, package and property restrictions, and other matters. Ohio Admin. Code Chapter 5120-9.
More important, the nature of the recorded telephone conversations show that Wolfe knew that the calls were being monitored. When Staley called, Wolfe first heard a message that an inmate was calling. Staley told her to watch what she said on the telephone. Wolfe's language in the conversations was coded. Investigator Ashbridge testified at the suppression hearing as to the recorded conversations, beginning with those of December 29, 1998:[8]
 THE WITNESS: Yes. During the conversation, this is a transcript but during the conversation they are talking, and Becky Wolfe's [sic] says you think of something to talk about when you call me back. And Ransom says, oh, I got a lot I want to talk about, we just can't talk about it.
And from December 30, 1998:
 A. Yes, sir. Becky says, okay, I'm not saying another word. And Ransom, says baby, I don't care if you talk, just watch what you say.
Q. Just watch what you say?
A. Yes, sir.
On January 4, 1999, Wolfe and Staley discussed his planned escape through coded language:
 A. There is — I don't have the transcript, but there was — from my notes, there was an attempt to transmit to Ransom the kind of car that was going to be used in the pickup and. [sic]
 Q. Did they just come out and say this is the car I rented?
 A. No. No. It says, did you get the blue? Becky says, no. Then it says, what color did you get? She says, a white — oh, God, but it is the same initials as green. No. I told you white, but you said initials, and I said same as green. Oh, no. The other something else, not even the, uh, same, uh, make. Now you got me lost, kid. I don't have any idea. Becky says, okay. I may as well say the Goddamn thing right out loud. And then she laughs.
 Q. Did she say it right out loud following that passage?
 A. No. Later on he said blue? Yeah. Yeah. And she said white. Well, it starts with a B, you got that much, and I got it baby. You sure. Huh? You sure? Okay. Yes. Yes. Well, not everything.
 I still have to figure out what to do with this here. Then she says, that car I almost hit was one of those Century's, brand new one. I thought I hit it, man. I would have been in trouble big time. Okay. And he says, yes.
Q. And that day she had rented a white Buick Century.
A. That's correct.
 Q. But she didn't specifically state that in the recording that honey, I rented a white Buick Century?
A. No. Obviously an attempt to conceal.
 Q. She says the first initial is B, then she says she almost hit a Century?
A. Yes.
 Q. But those are just a couple examples of highlighted passages. Are those the only examples that you can recall as listening to at this time?
 A. No. I listened to hours and hours of phone calls, and throughout those it was not necessarily statements that, you know, those calls are being record[ed] as much as there is an obvious — that that information was had by both parties on the phone.
 Q. They aren't having a normal, regular conversation about details on specifics and matters?
A. I'm sorry?
 Q. They're not offering specific details and spelling things out?
A. Not pertaining to this, no.
The evidence presented at the suppression hearing established that any expectation of privacy that Wolfe harbored was not reasonable. Wolfe cannot claim to have a privacy interest greater than that of Staley, an inmate. Above all else, the recorded conversations established that she and Staley knew that their conversations were being monitored.
The trial court properly denied Wolfe's motion to suppress the recorded conversations. The first assignment of error is overruled.
Assignment of Error No. 2:
 THE GUILTY VERDICT IN THIS CASE WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.
Wolfe contends that the state failed to provide sufficient evidence to support her conviction. She argues that the state failed to show that it was she who drove the car in which Staley escaped.
Whether the evidence is legally sufficient to sustain a conviction is a question of law. State v. Thompkins (1997), 78 Ohio St.3d 380, 386, rehearing/reconsideration denied, 79 Ohio St.3d 1451. When making this inquiry, an appellate court must determine whether the state has met its burden of production at trial. The court is to assess "not whether the state's evidence is to be believed, but whether, if believed, the evidence against the defendant would support a conviction." Id. at 390 (Cook, J., concurring). Thus, the court, after viewing the evidence in a light most favorable to the prosecution, must conclude whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Smith (1997),80 Ohio St.3d 89, 113, rehearing/reconsideration denied,80 Ohio St.3d 1471, citing State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
Complicity to escape is prohibited by R.C. 2921.34(A)(1) and 2923.03(A)(2). R.C. 2921.34(A)(1) provides:
 No person, knowing the person is under detention or being reckless in that regard, shall purposely break or attempt to break the detention, or purposely fail to return to detention, either following temporary leave granted for a specific purpose or limited period, or at the time required when serving a sentence in intermittent confinement.
R.C. 2923.03(A) provides:
 No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
* * *
(2) Aid or abet another in committing the offense[.]
The state clearly met its burden as to Staley's violation of R.C.2921.34(A)(1) because he was a MCI inmate when he escaped. We thus review only whether the state presented sufficient evidence that Wolfe aided and abetted Staley's escape.
Although "aid and abet" is not defined in the Revised Code, Ohio courts consistently have defined the term to mean to assist, incite, or encourage. Horstman v. Farris (1999), 132 Ohio App.3d 514, 527, discretionary appeal not allowed, 86 Ohio St.3d 1421.[9] "Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding and abetting of the act." State v. Stepp (1997), 117 Ohio App.3d 561, 568. Courts have previously stated, in that regard:
 Without previous connection with the transaction, one is not an aider and abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids; in order to aid or abet, whether by words, acts, encouragement, support or presence, there must be something more than a failure to object unless one is under a legal duty to object.
Id. at 569, quoting Smith v. State (1931), 41 Ohio App. 64, 68. A person is not an aider and abettor where that person's conduct, in relation to the offense, takes place wholly after the offense is committed. See Statev. Starr (1980), 24 Ohio App.2d 56, and State v. Harris (May 6, 1981), Hamilton App. No. C-800353, unreported. If there is any prior association, a person's participation in the criminal intent may be inferred from their presence, companionship, and conduct both before and after the offense is committed, as shown through either direct or circumstantial evidence. State v. Nievas (1997), 121 Ohio App.3d 451,456-457, appeal dismissed, 79 Ohio St.3d 1505; State v. McCarthy (M.C. 1999), 99 Ohio Misc.2d 11, 15.
The state presented circumstantial evidence that Wolfe was at the OPI warehouse when Staley fled. She and Staley planned Staley's escape for some time. They arranged for her to be at a certain location at the time of his escape. Although eyewitnesses saw only a blue truck or Jeep near the parking lot pay phone, there was testimony that another car could have been present but located so as to not be easily seen. No one saw Staley leave in the blue truck. When the Buick was found, its seats were arranged as if Wolfe had driven Staley to Texas.
More important, Wolfe was instrumental in the planning and preparation of Staley's escape. There are extensive recordings of her making preparations for Staley's escape. These conversations established that she encouraged and supported Staley's criminal conduct. Wolfe's post-escape endeavors with Staley confirm her prior aiding and abetting.
There was sufficient evidence by which the jury could find that Wolfe was present when Staley escaped from the OPI warehouse. More important, there was sufficient evidence to find that she aided and abetted Staley's escape when helping to plan it. The second assignment of error is overruled.
Assignment of Error No. 3:
 THE CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Wolfe contends that her conviction is against the weight of the evidence at trial. She argues that the recordings of her conversations with Staley were unreliable and lacked credibility because they did not fit the state's theory of her crime.
A challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. Thompkins,78 Ohio St.3d at 386-87. When inquiring into the manifest weight of the evidence, the reviewing court sits as the "thirteenth juror and makes an independent review of the record." Id. at 387; Tibbs v. Florida (1982), 457 U.S. 31,42, 102 S.Ct. 2211, 2218. In taking on this role,
 [t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of all witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Martin (1983), 20 Ohio App.3d 172, 175. A decision will not be disturbed on appeal as being against the weight of the evidence if reasonable minds could arrive at the conclusion reached by the trier of fact. State v. Fields (1995), 102 Ohio App.3d 284, 287.
The state's evidence showed that Wolfe aided and abetted Staley's escape. The Buick's seats were situated as if Wolfe had driven Staley to Texas, not as if she only met him there. Although Wolfe contended at trial that she was not present when Staley left the OPI warehouse, that contention only created an issue of fact for the jury to resolve. The jury decided the issue against Wolfe, and we cannot disagree.
More important, even had Wolfe not been present when Staley left the OPI warehouse, the recorded conversations showed that she was instrumental in planning the escape and in making preparations. Wolfe and Staley planned the escape over the phone and via letters for weeks preceding the escape. There were a number of reasons for the jury to conclude Wolfe aided and abetted Staley's escape.
Wolfe's conviction for aiding and abetting Staley's escape was not against the manifest weight of the evidence. The third assignment of error is overruled.
Assignment of Error No. 4:
 THE TRIAL COURT'S FINDING THAT THE SHORTEST PRISON TERM WOULD DEMEAN THE SERIOUSNESS OF THE DEFENDANT'S CONDUCT OR WOULD NOT ADEQUATELY PROTECT THE PUBLIC FROM FUTURE CRIME BY THE DEFENDANT OR OTHERS HAS NO SUPPORT IN THE RECORD.
Wolfe contends that the trial court should have imposed the shortest prison term, rather than a prison term greater than the minimum but less than the maximum possible sentence. She argues that a minimum sentence is proportional to her offense and will adequately protect the public.
Pursuant to R.C. 2953.08(G)(1), an appellate court may not disturb a sentence imposed under Senate Bill 2 unless it finds by clear and convincing evidence that the sentence is not supported by the record or is contrary to law or statute. Clear and convincing evidence is that evidence "which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." Statev. Garcia (1998), 126 Ohio App.3d 485, 487. The sentence imposed upon the offender should be consistent with the overriding purposes of felony sentencing: "to protect the public from future crime by the offender," and "to punish the offender." R.C. 2929.11(A).
Pursuant to R.C. 2929.14(A)(2), for a felony of the second degree the trial court may impose a prison term of two, three, four, five, six, seven, or eight years. If the offender has not served a previous prison term, the trial court must impose the minimum sentence of two years imprisonment, unless the trial court finds that to do so would "demean the seriousness of the offender's conduct" or "not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B). The trial court need not state the reasons underlying its required findings when imposing more than a minimum sentence pursuant to R.C. 2929.14(B).State v. Edmonson (1999), 86 Ohio St.3d 324, syllabus.
In the instant case, the trial court provided justification for imposing greater than the minimum sentence. The trial court recognized that Wolfe had no previous criminal history before her instant offense. However, in the course of committing the instant offense, and in the course of her month-long travels with Staley, Wolfe committed numerous offenses, including stealing license plates and grand theft of an automobile. More important, she aided and abetted the escape of a violent felon. The trial court stated:
 My concern is that in the abstract the aiding and abetting of an escape may not appear to be overly serious, but in this case the inmate Ransom Staley's [previous] offense was so egregious and he individually was so dangerous even though in your relationship maybe not, but clearly on the basis by which he got to the penitentiary there's no question of the seriousness of his offense and I think that bears on evaluating whether the short prison term would demean the seriousness of the crime.
This was not an improper evaluation by the trial court.
Further, the shortest prison term, or probation as requested by Wolfe, would not adequately protect the public. Participation in a prison escape is to be taken seriously, especially when a violent felon is involved. It is in the public's interest to deter similar future conduct by Wolfe and others. The trial court reached this same conclusion.
The trial court provided support on the record for its imposition of a greater than minimum prison term. The fourth assignment of error is overruled.
 __________________________ VALEN, J.
POWELL, P.J., and VALEN, J., concur.
[1] The facts surrounding Staley's imprisonment, individual escape, and eventual apprehension are included in this court's prior opinion, Statev. Staley (May 8, 2000), Madison App. No. CA99-08-019, unreported.
[2] Recordings of the telephone calls were played for the jury in Wolfe's trial. It is from the trial record that the content of the telephone calls is taken.
[3] Wolfe was charged with and convicted of the theft of the Buick. That conviction was affirmed upon appeal. State v. Wolfe (Sept. 20, 2000), Licking App. No. CA00 CA 7, unreported.
[4] Escape is a second degree felony where the inmate is imprisoned for a second degree felony, such as felonious assault. R.C.2921.34(C)(2)(a).
[5] The Fourth Amendment was made enforceable upon the states in Mappv. Ohio (1961), 367 U.S. 643, 655, 81 S.Ct. 1684, 1691.
[6] The opinion of the court in Katz does not explicitly set forth this test. Justice Harlan does so in his concurring opinion, recognizing that this test was expounded in previous opinions. 389 U.S. at 361,88 S.Ct. at 516.
[7] Thornburgh limited the scope of Procunier v. Martinez (1974),416 U.S. 396, 94 S.Ct. 1800, which concerned inmate First Amendment speech rights. Martinez set forth a less deferential, heightened scrutiny standard regarding prison regulations. Id. at 413-414, 94 S.Ct. at 1811.Thornburgh limited Martinez's application to only outgoing inmate mail, because "[t]he implications of outgoing correspondence for prison security are of a categorically less magnitude[.]" 490 U.S. at 413,109 S.Ct. 1881. Thus, the more deferential, reasonableness test is generally applicable when reviewing prison regulations and the effects of corrections practices.
[8] The following excerpts are from Investigator Ashbridge's testimony at the suppression hearing. Since this was the evidence reviewed by the trial court, we review the conversations as presented at the suppression hearing, rather than at trial.
[9] See, also, 4 Ohio Jury Instructions (2000), 573, Section 523.03(8) and (9).